554 F.2d 645
 Esther BUTLER et al., Appellants,
v.
Clyde COOPER, Magistrate of the City of Portsmouth, Judge
Donald Sandie, Judge of Portsmouth General District Court,
and Chief Ash, Portsmouth Police Department, and Detective
R. K. Gaddis, and Detective Hess, and Sgt. Detective Tally,
and Unknown Reliable Informant, and Phin Horton, City
Manager, and Richard Davis, Mayor of the City of Portsmouth,
Appellees.
 No. 76-1181.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 16, 1977.
Decided May 16, 1977.
 
 Richard A. Williamson, Williamsburg, Va., Marshall-Wythe School of Law, on brief, for appellants.
 Steve Lieberman, Portsmouth, Va., Asst. City Atty. (Gordon B. Tayloe, Jr., City Atty., Portsmouth, Va., on brief), for appellees Richard J. Davis, Mayor, and Phin Horton, City Manager.
 Thomas M. Whiteman, Norfolk Va. (Rixey & Heilig, Norfolk, Va., on brief), for appellees Chief Phillip L. Ash, Jr., Detective Richard K. Gaddis, Detective Lloyd Hess, Detective Lieutenant Richard A. Talley.
 K. Marshall Cook, Asst. Atty. Gen., Richmond, Va., (Anthony F. Troy, Atty. Gen. of Virginia, Richmond, Va., on brief), for appellees George W. Cooper, Magistrate of the City of Portsmouth, and the Hon. Donald H. Sandie, Chief Judge, Portsmouth General District Court.
 Before BUTZNER, RUSSELL and HALL, Circuit Judges.
 K. K. HALL, Circuit Judge:
 
 
 1
 The plaintiff, Esther Butler, filed this action pro se in the United States District Court for the Eastern District of Virginia. Her complaint alleged that the defendants, various officials and police officers of the City of Portsmouth, Virginia,[1] conspired to deprive her and all Black Americans in the City of Portsmouth of equal protection of the laws by disproportionate and racially selective enforcement of Virginia's liquor laws.[2] Under 42 U.S.C. § 1983, she sought injunctive and declaratory relief and monetary relief in the amount of $250,000 compensatory damages and $250,000 exemplary damages.[3] The district court granted defendants' motions for summary judgment, finding the plaintiff's allegations of denial of equal protection to be "vague and conclusory" and "unsupported by factual allegations." We agree and affirm.
 
 
 2
 The fourteenth amendment equal protection clause embraces a right to be free from racially discriminatory enforcement of a state's criminal laws. Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The plaintiff correctly stated that in alleging discrimination, one must do more than allege and prove that others have violated the law and are not being prosecuted. See, e. g., Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). Before a claim of unlawful discrimination in the enforcement of criminal laws can be established, the plaintiff must allege and prove a deliberate selective process of enforcement based upon race (or other arbitrary classification). Id.
 
 
 3
 Butler pleaded the requisite allegations, however, no substantial proof was offered in support thereof. The defendants allegedly conspired to deprive the plaintiff and other blacks of equal protection of the laws by enforcing Virginia liquor laws primarily against members of the black race in order to obtain court fines and city revenue. After finding that the plaintiff's complaint failed to state a cause of action against defendants, the district court granted her leave to submit "whatever additional material she . . . (thought) relevant and necessary." In response, the plaintiff merely stated:
 
 
 4
 That the gist of my facts to support the conspiracy allegation is as follows: That 98% of the people arrested under 4-58 A.B.C. Code are members of the Black race. As a result, 4-58 A.B.C. Code is being used to disproportionately, capriciously, and arbitrarily arrest the Plaintiff and other members of the Black race.
 
 
 5
 Defendants submitted certified copies of offense reports of the Portsmouth Police Department from September of 1973 through April of 1975 which arrest records disclosed that approximately 84% of all persons arrested for violating Virginia's Alcoholic Beverage Control Act during this period were Black Americans.[4] In addition, the defendants filed affidavits in connection with their motions for summary judgment denying the substance of the plaintiff's claim that they had engaged in a conspiracy to enforce the Commonwealth's liquor laws in a discriminatory manner.
 
 
 6
 Judge Kellam was right when he said, "Assuming . . . that plaintiff's contention is true (that 98% of these arrests were of blacks), that fact alone is wholly inadequate to support the conspiracy charge in this case. (S)he offers no other factual material of any type in support of her allegations. . . ." Butler v. Cooper, No. 75-49-N, 8 (E.D.Va. Aug. 13, 1975).
 
 
 7
 Moreover, the alleged purpose of the conspiracy must fail on its face. The Virginia liquor laws (including Va.Code § 4-58) are criminal statutes of the Commonwealth of Virginia. The City of Portsmouth receives no revenue from fines paid for violations of these laws. These court fines are paid directly into the treasury of the state.
 
 
 8
 In determining whether summary judgment is appropriate, a court must view the record in the light most favorable to the party opposing the motion. All inferences of fact from the proofs submitted must be drawn against the movant and in favor of the opposing party. United States v. Diebold, Inc.,369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The lower court construed the plaintiff's pro se pleadings and affidavits liberally.[5] Given these liberal standards in favor of the plaintiff, the record as viewed on appeal is totally devoid of a meritorious claim based on 42 U.S.C. § 1983 or § 1985. At best, this court can only recognize that approximately 84% of the persons arrested for liquor law violations in Portsmouth during the given period were members of the black race. Nothing in the record supports a theory of conspiracy to racially discriminate in the enforcement of these laws, least of all, not a naked allegation of percentage of black arrests.[6]
 
 
 9
 It is significant that in Rizzo v. Goode, supra, the Supreme Court of the United States denied injunctive relief under 42 U.S.C. § 1983 against local police officials who failed to correct their subordinate officers' violations of constitutional rights of individuals.[7] In reversing the judgment of the Court of Appeals for the 3rd Circuit, the Court stated that an aggrieved party could not enjoin officials from certain conduct absent a showing that the violation of constitutional rights by the subordinate policeman resulted from an affirmative policy or plan of the official. Id. at 377, 96 S.Ct. 598.
 
 
 10
 Moreover, the court in Rizzo held that the mere existence of a "statistical pattern" of police violations was not, in any event, sufficient to make the defendant city and police authorities liable under § 1983 for their failure to take corrective measures. Id. at 376-77, 96 S.Ct. 598.
 
 
 11
 It is evident from the pleadings and affidavits that there was never a showing of an affirmative policy or plan linking the plaintiff's alleged deprivation of constitutional rights with actions by any of the defendants. The plaintiff's arrests for violations of Virginia's liquor laws began back in 1946 as shown by her arrest record which was filed in district court. Her arrests and convictions have been numerous. Without more proof, we cannot permit this plaintiff to pursue an unfounded grudge in federal court.
 
 
 12
 There is no genuine issue of any material fact. The district court properly granted summary judgment.
 
 
 13
 AFFIRMED.
 
 BUTZNER, Circuit Judge, dissenting:
 
 14
 I dissent because the record discloses a genuine issue of material fact within the meaning of Rule 56 of the Federal Rules of Civil Procedure. Therefore, the district court erred in granting summary judgment.
 
 
 15
 In Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886), the court said:
 
 
 16
 Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.
 
 
 17
 The allegations of racial discrimination in Esther Butler's pro se complaint, supplemented by the records of the Portsmouth police department and her affidavits, disclose facts which, if proven at trial, would constitute a violation of the fourteenth amendment's equal protection clause as interpreted in Yick Wo.
 
 
 18
 The police arrested Butler, a fifty-year-old widow, for selling two cans of beer in her home. She was charged with selling alcoholic beverages in violation of state law[1] and with maintaining a disorderly house in violation of a city ordinance.[2] On three occasions she appeared in court, accompanied by her counsel and a privately engaged court reporter. Each time, the case was continued on motion of the prosecution over her objection. After the last continuance, a police officer suggested that she plead guilty to a lesser offense. Upon her refusal, she was convicted in the magistrate's court, fined $200, and sentenced to 60 days in jail. Ultimately, the case was dismissed on appeal because the police failed to file the search warrant as required by law. She charged that the prosecution was conducted in bad faith because of her support for civil rights. She alleged that the continuances were typical of trial delays forced on black defendants to coerce them to plead guilty to lesser charges.
 
 
 19
 In her complaint, Butler asserted a class action on behalf of all black persons similarly situated in Portsmouth. She alleged that approximately one-third of the city's population of 117,000 are black. She charged that despite this ratio, 98% of the people arrested for the sale of legal whiskey without a license are black. Amplifying this charge, she explained:
 
 
 20
 Members of the Black race have their own social clubs such as the Elk's Club, Masonic Temple, American Legion, etc. Members of the White race have their own social clubs such as the Elk's Club, Masonic Temple, American Legion, etc. Black undercover police officers are used to infiltrate the Black operated social clubs, especially the American Legion for Blacks, in order to obtain violations of 4-58 ABC Code. As a result, many Blacks are arrested in social clubs and placed in jail for violation of 4-58 ABC Code. Since the inception of the Portsmouth Police Department, the Police Department has never infiltrated and arrested any members of the White race in an Elk's Masonic or American Legion Club operated by members of the White race for violation of the 4-58 ABC Code. As a result, 4-58 ABC Code is being used to disapportionately, capriciously and arbitrarily arrest the Plaintiff and other members of the Black race.
 
 
 21
 The police records corroborate Butler's charge of disparity in the enforcement of liquor laws. Over a 20-month period, approximately 84% of the persons arrested for violating these laws were black.[3] Moreover, in many months, the ratio approached or exceeded 98%, as Butler alleges. For example, in October, 1973, all 39 people arrested for running a disorderly house were black. Similarly, in April, 1974, all 45 people arrested for this offense were black, and in June, 1974, all 57 arrested were black. Arrests for violations of the state ABC laws show a similar disparity. Thus, in November, 1973, all six of the persons arrested for violating these laws were black. The next month, all 13 arrested were black, and in January, 1974, only one out of the 17 persons arrested was white. The next month, all 16 of the persons arrested were black.
 
 
 22
 In contrast, the records show that for other crimes, including such related offenses as drunk driving and public drunkenness, there is no marked disparity between the number of black and white citizens arrested.
 
 
 23
 The appellees denied that they conspired to discriminate against Butler or members of her class. They have not explained, however, the disproportionate number of black people arrested for the unlicensed sale of legal whiskey.
 
 
 24
 In American Fidelity and Casualty Co. v. The London and Edinburgh Insurance Co., 354 F.2d 214, 216 (4th Cir. 1965), the court said with respect to granting a motion for summary judgment:
 
 
 25
 Not merely must the historic facts be free of controversy but also there must be no controversy as to the inferences to be drawn from them. It is often the case that although the basic facts are not in dispute, the parties nevertheless disagree as to the inferences which may properly be drawn. Under such circumstances the case is not one to be decided on a motion for summary judgment.
 
 
 26
 That principle of law is applicable to this case where the parties disagree as to the inferences which may reasonably be drawn from the pleadings, affidavits, and exhibits. Furthermore, there is a direct conflict between the charge and the denial of utilizing undercover agents for the selective prosecution of black citizens.
 
 
 27
 Under the principles set forth in Yick Wo, Butler has established a cognizable claim that the police infringed rights secured by the equal protection clause. Therefore, she should be allowed to proceed to discovery.
 
 
 28
 Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), on which the appellees rely, is not to the contrary. In that case, the district court held a full evidentiary hearing. The Supreme Court noted that 250 witnesses were heard. It explained:As the facts developed, there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners express or otherwise showing their authorization or approval of such misconduct. 423 U.S. at 371, 96 S.Ct. at 604.
 
 
 29
 Rizzo does not hold that statistics indicating a pattern of discrimination are insufficient to defeat a motion for summary judgment. Rather, in Rizzo the complainants failed to prove their allegations after a full evidentiary hearing. Unlike the complainants in Rizzo, Butler has not even been given a chance to proceed to discovery, much less to prove her case at trial.
 
 
 30
 Despite the suggestion to the contrary, Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), does not support the grant of summary judgment. The Supreme Court described the deficiency of the complaint in that case as follows:
 
 
 31
 It is not stated whether the failure to proceed against other three-time offenders was due to lack of knowledge of the prior offenses on the part of the prosecutors or was the result of a deliberate policy of proceeding only in a certain class of cases or against specific persons. 368 U.S. at 456, 82 S.Ct. at 505-506.
 
 
 32
 In contrast, Butler has alleged and reaffirmed in subsequently filed affidavits that the appellees' selective prosecution of black persons resulted from a deliberate policy of racially motivated enforcement.
 
 
 33
 Never before have we required proof of racial discrimination before permitting a plaintiff to go to trial in a § 1983 action. Rather, we have adhered to the sound principle that trial should be ordered, and summary judgment denied, when the record discloses a genuine issue as to any material facts, or to the inferences that may reasonably be drawn from them about such discrimination. Butler has satisfied this test. Therefore, I would vacate the judgment of the district court and remand the case for further proceedings, including disposition of the defenses of privilege. Butler's allegations, if true, would prove a serious violation of the constitutional rights of many people. For this reason, I would direct the district court to appoint a lawyer to represent her, if she is unable to retain one, so that her evidence can be intelligently marshalled and presented to the court.
 
 
 
 [1]
 The complaint named the following defendants:
 Clyde Cooper, Chief Magistrate of the City of Portsmouth
 Donald Sandie, Judge of the Portsmouth General District Court
 Phillip L. Ash, Jr., Chief of the Portsmouth Police Department
 Richard K. Gaddis, Lloyd Hess, and Richard A. Tally, officers of the Portsmouth Police Department
 Phin Horton, City Manager of the City of Portsmouth
 "Unknown Reliable Informant" of the Portsmouth Police Department
 
 
 [2]
 The plaintiff was arrested on or about September 20, 1974, at her home in Portsmouth, Virginia. She was charged with maintaining a disorderly house and with selling liquor without a license in violation of § 4-58 of the Virginia A.B.C. Code. Although she was convicted, fined and sentenced by the Portsmouth General District Court, appeal to the Circuit Court for the City of Portsmouth resulted in her acquittal because the search warrant had not been located and properly placed in the Circuit Court record as required by Virginia statute. However, the federal district court below was given an opportunity to examine the search warrant and supporting affidavits. The warrant was found to be constitutionally valid
 
 
 [3]
 Although the complaint alleged various other claims for relief, this appeal is concerned with only the district court's grant of summary judgment for defendants for the claims for damages and injunctive relief made under 42 U.S.C. § 1983
 
 
 [4]
 The arrest records did not specify the number of blacks arrested for violation of § 4-58 of the Virginia A.B.C. Code. Three hundred and twenty-two persons arrested for violating provisions of the Alcoholic Beverage Control Act were members of the black race; fifty-four were white
 
 
 [5]
 Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), requires that the allegations of a pro se complaint are to be held to less stringent standards than formal pleadings drafted by lawyers
 
 
 [6]
 In Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), the Supreme Court of the United States noted that official conduct is not unconstitutional merely because its impact is racially disproportionate. Four times more blacks than whites had failed a police officers qualifying test. The Court said, "(O)ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact."
 
 
 [7]
 Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), suggests that "principles of federalism" which restrain federal courts from enjoining state judicial proceedings may also restrict the availability of federal injunctive relief against state and local agencies. Developments in the Law, Civil Rights Acts, 90 Harv.L.Rev. 238-47 (1976)
 
 
 [1]
 Va.Code Ann., § 4-58 provides in part:
 If any person who is not licensed under the provisions of this chapter to sell alcoholic beverages in this State shall sell any alcoholic beverages other than permitted by the provisions of this chapter, he shall be guilty of a misdemeanor.
 
 
 [2]
 Portsmouth Code, § 21-95 provides in part:
 (a) It shall be unlawful for any person in the city to keep, maintain or operate for himself or for any other person or as an officer of or agent for any corporation, association, club, lodge or other organization or under the guise of any corporation, association, club, lodge or other organization any disorderly house or place of illegally dispensing or indulging in intoxicating liquors, gaming or boisterous or other disorderly conduct. Each day's keeping of any such place shall constitute a separate offense, and in any prosecution for this offense, the general reputation of such place may be proved. Violation of this section shall be punished as a Class 1 misdemeanor.
 
 
 [3]
 During the 20-month period from September, 1973, through April, 1975, the police issued 1200 warrants for the unlicensed sale of alcoholic beverages and the maintenance of disorderly houses. One hundred eighty-seven of the warrants (15.6%) were issued against white people; 1013 (84.4%) were issued against black people